## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Michael A. Gagnon, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent of the U.S. Drug Enforcement Administration (DEA) and have been employed in that capacity for approximately eight years. I am currently assigned to the DEA's Boston Division, Portland, Maine, Resident Office. During my employment with the DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, cocaine base, heroin, methamphetamine, marijuana, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Section 841. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I have been the Affiant on affidavits in support of search warrants, arrest warrants, and other applications. I have also participated in other electronic intercept investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

2.  The facts in this affidavit come from my personal observations, my training and experience, phone analysis, and information obtained from other agents and witnesses.

3.  I submit this affidavit in support of a criminal complaint charging Hunter York with possessing with intent to distribute a mixture or substance containing N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as "fentanyl"), and possessing with

1

intent to distribute a mixture or substance containing 3,4 methylenedioxymethamphetamine ("MDMA" or "Ecstasy"), and Mercadies Trepanier with possessing with intent to distribute Ecstasy, all in violation of Title 21, United States Code, Section 841(a)(1).

## FACTS SUPPORTING PROBABLE CAUSE

### Portland Overdoses

4. On February 3, 2020, agents with the Maine Drug Enforcement Agency (MDEA) learned of three drug overdoses that occurred between January 31, 2020 and February 1, 2020 in Portland. Two overdoses occurred at the same residence, the second floor apartment at 115 Dartmouth Street, Portland. The third overdose occurred at a restaurant in Portland. All parties were transported to Maine Medical Center for further care. MDEA agents were able to speak with the individual that experienced the overdose at the restaurant after his treatment and release. This individual, hereinafter referred to as Cooperating Informant ("CI"), explained that on January 31, 2020, CI contacted Mercadies Trepanier (hereinafter 'Trepanier') to purchase a half gram of powder cocaine for $40.00. The hand-to-hand transaction was arranged by Trepanier's boyfriend, Hunter York. The CI eventually met with a relative of Trepanier at a restaurant in Portland, who provided CI with what CI believed to be a half gram of powder cocaine. The CI reported having purchased powder cocaine from York 2 - 3 times over the past 4 - 5 months. CI explained that York, Trepanier and Trepanier's relative all reside at the second floor apartment at 115 Dartmouth Street in Portland.

### Hunter York Traffic Stop

5. On February 5, 2020, York was pulled over after he was seen leaving 115 Dartmouth Street and after officers observed numerous traffic infractions. During the stop, and

2

after ordering York out of the vehicle, officers observed between the driver side door and front seat a plastic bag containing a white powder (suspected cocaine). Officers also observed on the rear seat a sweatshirt covering what appeared to be a small rifle.

6. York was searched. Officers located on York (1) approximately 13 grams of inositol powder (a known narcotic cutting agent); (2) 11 capsules containing suspected MDMA (agents later field-tested the capsules, which resulted in a presumptive positive for the presence of MDMA)[1]; (3) approximately 25 grams of suspected fentanyl pills (agents later field-tested these pills, resulting in a presumptive positive for the presence of fentanyl)[2]; and (4) a cell phone.

7. Officers then searched York's vehicle. During the search officers located the following: (1) .22 caliber rifle; (2) $801 in US currency; (3) a loaded .38 caliber revolver; (4) a digital scale with suspected cocaine residue; (5) several plastic bags in the rear of the driver seat with the corners cut off; (6) 9mm ammunition; and (7) a money counter.[3]

### Search of 115 Dartmouth

8. Officers then drove to York's residence, which was a second floor apartment at 115 Dartmouth Street. They were invited into the residence by Trepanier's relative. Trepanier and two other people were also present. During a protective sweep, officers observed items indicative of drug trafficking. The apartment was then secured until a search warrant could be

---

[1] This amount of pills, in conjunction with the other items indicative of drug trafficking noted below, is inconsistent with user-level amounts and reflective of an intent to distribute.
[2] A photograph of the fentanyl pills recovered is attached at Exhibit A. Both the total quantity of pills recovered as well as the manner in which the pills were packaged are inconsistent with user-level amounts and are indicative of an intent to distribute.
[3] Based on my education, training and experience I know individuals involved in the sale of narcotics will often package narcotics in plastic bags. The individuals with then tie the narcotics in the corner of the bag (commonly referred to as 'Dominican tie') and then sell the bag containing the narcotics as is or cut or tear the corner off. I am also aware that drug traffickers use money counters and firearms to further their drug trafficking.

3

obtained. There were two bedrooms in the apartment. Trepanier's relative identified the first bedroom on the right as his. The second bedroom was identified by Trepanier as the bedroom she shared with York. A later search of the second bedroom resulted in the recovery of, among other things, the following:

- A brown paper bag located on the bed containing two large stacks of money. The bundles were all one-dollar bills totaling $681.00.[4]
- A plastic sandwich bag containing blue pills located in a purse that Trepanier claimed belonged to her. The pills appeared similar to those seized during the traffic stop and field-tested positive for the presence of MDMA.[5]
- $3,598.00 in US currency.
- A digital scale and plastic packaging materials.
- A shoe box under the bed containing: (1) two handguns; (2) a plastic bag that further contained a white powder that weighed approximately 129 grams and field-tested positive for the presence of fentanyl; and (3) a plastic bag containing a brownish powder which weighed approximately 54 grams and field-tested positive for the presence of MDMA.
- Three large stacks of money totaling $1,503.00 in U.S. currency.
- A 9mm semi-automatic pistol magazine containing six 9mm bullets.

---

[4] Mercadies Trepanier insisted that this money was her tattoo money and that she wanted to take it and leave. While she was told that she was permitted to leave, she was not permitted to take the money with her.
[5] A photo of the pills recovered from the purse is attached as Exhibit B. Both the quantity of pills recovered as well as the manner in which the pills were packaged are inconsistent with user-level amounts and are indicative of an intent to distribute.

- A safe on the bedroom floor containing (1) white brick-like chunks which collectively weighed approximately 611grams and field tested positive for the presence of fentanyl[6]; and (2) an additional $8,275.00 in US currency. The key to the safe was located in a drawer at the foot of the bed.

9. After the search was completed, and as agents were leaving, Trepanier's relative insisted that all the items recovered from the second bedroom were his.

### York Cell Phone Searched

10. On February 11, 2020, agents applied for and obtained a search warrant to extract data from York's phone that was seized during the traffic stop. During the phone extraction, agents observed text message communications that occurred January 28, 2020 and January 31, 2020 between York and a number listed in his phone under contact name "Dom." Those conversations, as well as my interpretation of those conversations, are outlined below:

January 28, 2020

Dom: "We should just find some dopehead to buy that other one I still have kicking around it's a full brick I'd let go for 5/10k lol."

York: "We could do that we could chop it up and flip it." Dom replies "It still cooks back too, if we did it the right way an washed it afterwords It might be good."

Dom: "Let's try n figure somthing out I'll I'll legit split the profits right down the middle with you cuz rn it's just a big paperweight."

York: "Im down bro fuck it."

York: "What should we use to chop it up."

Dom: "That's a good question lol."

---

[6] Based on my training and experience, the net weight (weight absent the packaging) of the fentanyl is greater than 400 grams. This amount of fentanyl is inconsistent with personal use amounts and is indicative of an intent to distribute.

York: "I got addies and amphetamines and nos."

Dom: "Oh shit."

York: "Ight brotha I'll keep my phone close."

Dom: "I just gotta go grab it from homeboy I stored it somewhere else for safety reasons."

York: "I feel u lmk as soon as u get it."

Based on my training, experience, and knowledge of this investigation, I believe that in this conversation Dom is telling York that Dom is still in possession of a kilogram "full brick" of fentanyl and further states that he (Dom) and York should find a drug user to buy the kilogram for five to ten thousand dollars ("5/10k"). York then suggests cutting the fentanyl ("chop it up") and selling it ("flip it"). Dom agrees with York and tells York that he (Dom) will split the profit. York then describes to Dom all of the different substances that York has available to cut the fentanyl with ("addies and amphetamines and nos"). Dom then tells York that he (Dom) needs to go get the fentanyl ("go grab it") from someone.

January 29, 2020

York: "I got some work to mix with it and I got another 1000 toward what we need."

York: "Lmk a price on all of that."

Dom: "Lmk a price on all of that."

Dom: "We can see if we can do anything with it."

York: "I know we can grab it."

Dom: "It's so strong we could prob turn it into like 5 times the amount if not more."

Dom: "I'll bb in like a hour with it."

6

*York: "That's what I'm saying we gotta get this money."*

In this conversation, Dom and York are continuing their previous conversation about cutting and selling the kilogram of fentanyl. York tells Dom that he (York) has additional substances ("work") to cut the fentanyl with as well as 1000 dollars ("I got another 1000") to put towards the cost of the fentanyl. Dom then tells York that the fentanyl ("it") is so strong that they (Dom and York) should be able to turn the kilogram of fentanyl into 5 times the amount if not more. York agrees with Dom and further states that they "gotta get this money."

<u>January 31, 2020</u>

*Dom: "Double check whoever gets that few hours after you give it to him just to be sure you mixed it safely."*

*York: "I got u brotha I'm chopping it up tonight."*

In this conversation, Dom is telling York to check with the people he (Dom) sells the fentanyl to make sure it was cut enough ("mixed it safely"). York then tells Dom that he is cutting the fentanyl that night ("I'm chopping it up tonight").

## CONCLUSION

11.  Based on the above, I respectfully request that a criminal complaint be issued charging Hunter York and Mercadies Trepanier with possessing with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

Michael A. Gagnon
Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Fed. R. Crim P. 4.1

Date and Time:
7/20/2020, 4:10PM

City and State:
Portland, ME

John H. Rich III,
U.S. Magistrate Judge